William B. GLOVER, Plaintiff,

v.

JOHNS–MANVILLE CORPORATION,
Defendants and Third-Party
Plaintiffs,

v.

UNITED STATES of America,
Third-Party Defendant.

Civ. A. No. 78–648–N, C/P 77–1–N.

United States District Court,
E. D. Virginia,
Norfolk Division.

Dec. 21, 1979.

C. Michael Montgomery, Steven G. Schwartz, Norfolk, Va., for Johns-Manville Corp.

William V. Hoyle, Philip S. Payne, Newport News, Va., for Raybestos Manhattan.

Jack E. Greer, Norfolk, Va., for Owens-Corning Fiberglas Corp.

John Y. Pearson, Jr., Norfolk, Va., for Celotex Corp.

Gerard E. W. Voyer, Norfolk, Va., for Unarco Industries.

Archibald Wallace, III, Richmond, Va., for H. K. Porter Co. & Southern Textile Co.

William B. Eley, Norfolk, Va., for J. P. Stevens & Eagle-Picher Industries, Inc.

Worth D. Banner, Norfolk, Va., for Pittsburgh Corning Corp.

Harry J. Kostel, Newport News, Va., for GAF.

Neil R. Peterson, U. S. Dept. of Justice, Civil Division, Washington, D. C., Joseph B. Cox, Newport News, Va., for United States.

## MEMORANDUM OPINION

MacKENZIE, Chief Judge.

On the one hand this is a complex case. Attorneys here representing the third-party plaintiffs, the manufacturers of countless asbestos products, are capable attorneys

whose facile minds have served to shape many issues upon which this Court, to satisfy appellate review, must comment in detail in the pages following. Suffering, however, in its simplicity, this Court finds the case not really so complex as counsel have chosen to make it.

The plaintiff, Glover, was found to be disabled as a result of asbestosis incurred during the course of his employment at the Norfolk Naval Shipyard. Without regard to proof of actual negligence insofar as his employer was concerned, he was, and is, entitled to workmen's compensation. The record indicates that he has been paid $45,-582.40 since he was retired in 1975 and is presently drawing compensation at the rate of $16,275.22 per year. This is proper. It is the basic concept of workmen's compensation. Having paid these sums and being obligated as it is to continue paying these sums, the United States is meeting its responsibility under the applicable Compensation Act. In our view, such payments under the Federal Employees' Compensation Act are the proper compensation to be paid by an industrial employer for accidents on the job and that is, and we declare it to be in this case, the limit of the United States' liability.

An effort is made by the manufacturers [via the *Wallenius Bremen v. United States,* 409 F.2d 994 (4th Cir. 1969), *cert. denied* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970) concept] to show that under "an active" and "passive" theory of negligence their own negligence has only been lesser or "passive" and that the United States should incur the total liability, including any incurred by the manufacturers, on the theory that the active negligence of the United States supersedes the passive negligence of the defendant manufacturers. The evidence in this case nowhere approaches any showing that the manufacturers were a lesser or "passive" force as opposed to any supposed "active," overwhelming misfeasance of the United States. These were national manufacturers, maintaining national sales staffs, regional sales offices, special sales representatives and programs to interest and sell their products to the United States, their major customer. In our view their effort to impose the woes of asbestos contamination upon the customer whom they so actively pursued is grossly misplaced.

In this particular case, the several manufacturers of asbestos-containing thermal insulation products attempt to make the United States ultimately liable for the disabling asbestosis contracted by William Glover, a pipe coverer and insulator at the Norfolk Naval Shipyard. The manufacturers sue the government for indemnity, claiming that the United States was "actively" negligent in causing Glover's injuries by failing to warn him of the latent danger or to protect him from injurious exposure to asbestos, and that, in comparison, the manufacturers were but "passively" negligent. Consequently, the manufacturers contend that the damages owed Glover for his injuries should be paid by the government exclusively.

We find ourselves confronted with an array of legal and factual questions, the answers to which promise to shape the course of asbestos litigation pending in this Court. Accordingly, we must address all of these issues for purposes of appeal, even if not essential to the case at hand.

We will deal first with the government's contention that, as a matter of law, the manufacturers have no cause of action for noncontractual indemnity against the United States. We will also review the evidence to determine whether, on the facts, the manufacturers have established that they are entitled to indemnification.

I

*Background*

The plaintiffs here bringing this indemnity claim were originally defendants in a personal injury suit brought by Glover, one of a number of workers injuriously exposed to asbestos-containing products at the Norfolk Naval Shipyard. Glover worked in the Yard from 1940 to 1975 and, until his retirement on disability, handled a variety of

asbestos-containing products in the course of his employment at the pipecovering and insulation shop, commonly referred to as Shop 56.

■ Subsequently, Glover filed suit against the manufacturers of asbestos-containing products used at the Shipyard. Glover first brought his suit in the Circuit Court for the City of Portsmouth on September 28, 1976, then filed his complaint in this Court on December 13, 1978. By an Order dated March 9, 1979, we found that the state court filing tolled the applicable Virginia two-year statute of limitations and that, accordingly, Glover would be allowed to prove his case based upon exposures to asbestos at the Yard from September 28, 1974 to January 15, 1975, at which time Glover left the yard on sick leave and was not thereafter exposed to asbestos. For purposes of the present indemnity suit, the above-stated exposure period is important, because we similarly limit our assessment of the negligent acts of the government and the manufacturers toward Glover.

In his complaint, Glover alleged that the manufacturers had failed to warn him of the dangers involved in inhaling asbestos fibers and that the manufacturers had not instructed him adequately as to the wearing of safety equipment in his work around asbestos-containing products. As a result, Glover maintained, he developed asbestosis.

Shortly after Glover filed his claim in this Court, the manufacturers filed a third-party complaint against the United States, seeking indemnification in the event that Glover should prevail on his claim for damages against them. The manufacturers subsequently settled Glover's claim before trial, and proceeded to file an amended third-party complaint, this time seeking indemnity or alternatively, contribution from the government.

In the amended complaint, the manufacturers claimed that they were entitled to indemnity not only because of the government's negligence with reference to Glover, but also because of the government's breach of certain contractual duties, owed to the manufacturers, to exercise due care in the handling of asbestos-containing products. By an Order dated September 13, 1979, we dismissed those counts raising contractual claims for indemnity on jurisdictional grounds.

As a result, the single remaining theory of indemnity argued at trial and now before this Court involves the government's alleged negligent conduct with respect to Glover. These manufacturers of asbestos products contend that the government failed to protect Glover from known risks attendant to Glover's shipyard use of manufacturers' products, and that such failure was active negligence for which the United States, and not the manufacturers, should bear full responsibility.

## II

### *Discussion*

#### A

*Can the Government be subject to the indemnity suit under the law of this case?*

1. *Is Wallenius Bremen Controlling?*

The manufacturers maintain that *Wallenius Bremen v. United States,* 409 F.2d 994 (4th Cir. 1969), *cert. denied* 398 U.S. 958, 90 S.Ct. 2164, 26 L.Ed.2d 542 (1970), sanctioning a third-party noncontractual indemnity claim against the United States even though the government was insulated from tort liability to its employee, is a controlling precedent for this case. The United States, in turn, contends that *Wallenius Bremen* is distinguishable, or alternatively, that the *Bremen* decision is erroneous and should be ignored.

As a preliminary question, then, this Court must decide whether *Wallenius Bremen* authorizes the indemnity claim now before it.

*Bremen,* like the present case, involved a claim for tort indemnity brought by a third-party plaintiff who had settled a personal injury claim with a federal employee. Indeed, as in the present case, the injured employee in *Bremen* received compensation ·for his injuries under the Federal Employ-

ees Compensation Act (FECA) and thus was precluded, by the terms of the Act, from suing the government in tort. Consequently, in finding that the United States could be subject to a third-party indemnity suit, the Fourth Circuit passed on the same two questions of law confronting this Court: (1) whether the wording of the FECA exclusivity provision barred indemnity claims brought by parties in the position of the third-party plaintiff; and (2) whether a noncontractual claim for indemnity against the United States was possible when the United States, from whom indemnity was sought, could not be liable in tort to the original plaintiff.

Despite these apparent similarities, a closer reading of the *Bremen* case reveals that the Fourth Circuit's decision is plainly distinguishable from the present suit. The indemnity-seeking shipowner in *Wallenius Bremen* brought suit under *both* the Federal Tort Claims Act and the Suits in Admiralty Act. The present case involves a claim brought under the Federal Tort Claims Act *only*. The additional basis for jurisdiction in the *Bremen* case is of vital importance in a careful reading of that opinion because, as we interpret that decision, *Bremen* must have been decided under the Suits in Admiralty Act and not under the Federal Tort Claims Act. Admittedly, the Fourth Circuit did not announce its intention to handle the *Bremen* case exclusive of the Federal Tort Claims Act. Yet, it is obvious from the rationale employed by the Fourth Circuit in *Bremen* that the court did not resolve the indemnity question in the way it would have resolved the issue if it had done so under the Federal Tort Claims Act.

In allowing tort suits to be brought against the United States under the Federal Tort Claims Act, Congress provided that the government could be liable only "if a private person would be liable to the claimant *in accordance with the law of the place where the act or omission occurred*," 28 U.S.C. § 1346(b) (emphasis added). The Suits in Admiralty Act, on the other hand, contains no such directive. Because *Bremen* involved an indemnity claim arising out of a personal injury suffered in Virginia, clearly the Fourth Circuit, if it had decided the case under the Federal Tort Claims Act as well as the Suits in Admiralty Act, would have looked to Virginia law to determine the government's liability. Title 28 U.S.C. § 1346(b) directs a court to decide such a Federal Tort Claims Act case in accordance with law of the place where the act occurred, Virginia indemnity law.

Yet the *Bremen* court neither referred to the directive of 28 U.S.C. § 1346(b) nor looked to Virginia indemnity law to decide whether the United States could be liable in indemnity. To the contrary, the Fourth Circuit apparently proceeded on the assumption that it had the luxury to choose its own "better rule" of indemnity:

> As for the law of indemnity, we think the better rule is that which rests the right of indemnity upon violation of a duty of care to the injured person rather than upon tort "liability." 409 F.2d 998.

Accordingly, the Fourth Circuit concluded that an indemnity claim would lie against the United States, notwithstanding the government's absence of tort liability to the injured party:

> [W]e are unable to see why in addition to breach of duty, there must be indemnitor's *liability* to the injured party. If the purpose of indemnity is to relieve the relatively innocent wrongdoer and shift the burden to one whose conduct is more blameworthy, the fact that the latter has a personal defense, if sued by the injured person, would seem to be irrelevant. *Id.*

In so holding, the *Bremen* court achieved a result totally contrary to any result that would have been reached under Virginia state law. *See Jennings v. Franz Torwegge Machine Works*, 347 F.Supp. 1288 (W.D.Va. 1972); *Drumgoole v. Virginia Electric & Power Company*, 170 F.Supp. 824 (E.D.Va. 1959).

Consequently, we conclude that the Fourth Circuit decided *Bremen* under the Suits in Admiralty Act rather than under the Federal Tort Claims Act. To view *Bremen* in any other light would expose the

decision to criticism. As a case decided under the Suits in Admiralty Act and absent any reference to Virginia law, then, *Bremen* is distinguishable from the present case and does not control this Court's resolution of the indemnity question before it.

2. *Can the Government be liable for indemnity under the Federal Tort Claims Act when the original plaintiff sued the manufacturers for injuries sustained in Virginia?*

Resolving this case under the Federal Tort Claims Act involves the addressing of an additional question, also raised by the language of the Act. Title 28 U.S.C. § 2674 provides that the United States may be liable only "in the same manner and to the same extent as a private individual under like circumstances." In effect, the manufacturers should be able to seek indemnity from the United States for the claim that they have settled with Glover only if (1) Virginia indemnity law subjects a party to indemnity when that party is not liable in tort to the original plaintiff; and if (2) private employers in Virginia, situated similarly to the government in the present case, may be sued for indemnity, when such claims arise from injuries to their employees who are barred from tort suit by the state workmen's compensation scheme. The Court will deal with each of these matters separately.

a. *Virginia Indemnity Law.*

For the sake of clarity, it is worth noting that we turn to Virginia indemnity law to decide what was, in effect, a second question confronted by the Fourth Circuit in *Wallenius Bremen.* Before holding that the government could be sued for indemnity, irrespective of the absence of tort liability to its injured employee, the Fourth Circuit first examined the FECA exclusivity provision to determine whether the statute precluded third-party indemnity suits against the government *altogether.* Construing 5 U.S.C. § 8116(c) to bar tort claims by persons "deriving their claims from a personal relationship to the government employee," 409 F.2d at 995, the *Bremen* court refused to find that the provision cut off the indemnity rights of "third-party tort-feasors who

are also victims of the government's tortious conduct . . . ." *Id.*

Insofar as this Court is free to construe the scope of 5 U.S.C. § 8116(c) on its own, the Court finds the Fourth Circuit's interpretation of the FECA exclusivity provision to be persuasive. Certainly, the directive of 28 U.S.C. § 1346(b) has no effect upon our construction of the provision, since the question of statutory interpretation, involving as it does a matter of Congressional intent, is not a question for local substantive law. Rather, construction of the FECA exclusivity provision implicates federal concerns, and is best performed in keeping with federal law, separate from the question of liability under state law. *Cf. Donham v. United States,* 536 F.2d 765 (8th Cir. 1976), *aff'd. sub nom. Stencel Aero Engineering Corp. v. United States,* 431 U.S. 666, 97 S.Ct. 380, 50 L.Ed.2d 325 (1977).

On the other hand, the indemnity law question, in keeping with 28 U.S.C. § 1346(b), requires handling under local law. Without exception, the courts have held that, under Virginia law, the right to noncontractual indemnity arises only when the party from whom liability is sought may be liable in tort to the original plaintiff. *See Jennings v. Franz Torwegge Machine Works, supra; Drumgoole v. Virginia Electric & Power Company, supra. See also Norfolk Southern R. Co. v. Gretakis,* 162 Va. 597, 174 S.E. 841 (1934).

In *Norfolk Southern R. Co. v. Gretakis, supra,* a child was injured when the car in which she was a passenger collided with a streetcar operated by the railroad. When the child sued the railroad and recovered a judgment, the railroad sued the child's father for contribution, claiming that he had acted negligently as driver of the automobile at the time of the accident. Recognizing that the father could not be subject to an ordinary negligence suit brought by his daughter, the *Gretakis* court ruled that the railroad was precluded by law from seeking contribution from the father. The Court reasoned that:

[T]hough the concurring negligence of two persons may have resulted in an indivisible injury to a third, if the third person has a cause of action against only one of them, that we cannot enforce contribution from the other. *Id.* at 842.

■ Though the *Gretakis* case involved a claim of contribution, the Virginia Supreme Court did not indicate, then or later, that its view of indemnity would differ in any material way from the view of contribution expressed in *Gretakis.* Moreover, contribution and indemnity are in many respects kindred principles of equity, designed to shift the liability (or a portion of it) unfairly borne by one tort-feasor to another.

Certainly, courts required to construe Virginia law since *Gretakis* have employed the decision as the cornerstone for their rulings on indemnity questions similar to the question confronting this Court.

For example, in *Jennings v. Franz Torwegge Machine Works, supra,* an installer of machinery sued an employer for indemnity after a workman for the employer sustained injuries and successfully sued the installer for damages. The installer claimed that the employer had not instructed the workman as to safe use of the injury-causing machine. Because the workman had received workmen's compensation benefits, he could *not* sue his employer in tort. *See* Va.Code § 65.1–40. Consequently, citing *Gretakis* as its authority, the *Jennings* court held that the employer could not be sued for indemnity unless he also could have been liable to the injured workman. In short, the employer was "insulated from *any* tort liability," even from indemnification claimed by a third-party like the installer. *Id.* at 1290. *See also Mahone v. McGraw Edison Company,* 281 F.Supp. 582 (E.D.Va.1968).

Moreover, in keeping with the logic of *Gretakis,* a federal court has applied Virginia law to dismiss a third-party indemnity claim brought against the government under the Federal Tort Claims Act. In *Drumgoole v. Virginia Electric & Power Company, supra,* a third-party plaintiff sought to shift liability to the United States arising from a personal injury claim brought by members of the Army Reserve. Accordingly, plaintiff sued for contribution and/or indemnity under the Federal Tort Claims Act. By the *Feres* doctrine, the Reserve members were barred from bringing personal injury claims against the government. Consequently, the *Drumgoole* court dismissed the third-party plaintiff's claims, reasoning as follows:

Virginia, while permitting contribution between co-tortfeasors, withholds it as against a joint offender who cannot in law be forced to answer to the plaintiff for his negligence .... *Indemnity, likewise, in the same circumstances would be withheld. A priori, as the claimed contribution and indemnity must depend for success upon the alleged negligence of the Government towards the plaintiffs, and that is a negligence which is not actionable, the claim must fail. Id.* at 825–26. [Emphasis added.]

■ Clearly, then, deciding the indemnity question in accordance with Virginia law as directed by 28 U.S.C. § 1346(b), the manufacturers have no cause of action for indemnity against the United States in this case. The rule of *Gretakis,* as applied to indemnity cases by courts in *Jennings* and *Drumgoole,* only sanctions a claim for non-contractual indemnity where the proposed indemnitor may be *liable* in tort to the original plaintiff. In this case, the original plaintiff, Glover, could not bring a personal injury claim against the government because as a federal employee, he received FECA benefits from the government. Consequently, the manufacturers do not now have a claim for indemnity against the government precisely because Glover was precluded from suit against his employer. In essence, our reading of Virginia law requires us to hold that the government has to be liable in tort to Glover before the government could also be held to indemnify third-party plaintiffs seeking indemnity based upon the government's negligence toward Glover. The absence of tort liability, an absence created by the FECA's exclusivity provision, is fatal to the manufacturers' case.

Obviously, such a holding is somewhat at odds with the *Bremen* decision and the Fourth Circuit's declaration that, for purposes of an indemnity claim, "we are unable to see why in addition to breach of duty there must be indemnitor's liability to the injured party." 405 F.2d at 998. Yet, as we noted earlier in assessing the impact of *Bremen* on the present case, the *Bremen* court apparently decided the indemnity question without regard for Virginia law.

The United States Supreme Court decisions cited by the Fourth Circuit in *Bremen* and now cited by the manufacturers have no bearing upon Virginia indemnity law or the result we have reached in applying it. Both *Weyerhaeuser S. S. Co. v. United States*, 372 U.S. 597, 83 S.Ct. 926, 10 L.Ed.2d 1 (1963) and *Ryan Stevedoring Co. Inc. v. Pan-Atlantic Steamship Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956) are readily distinguishable from the present case. In *Weyerhaeuser*, the court held that the FECA exclusivity provision did not abrogate an indemnity suit against the government when the suit was based upon the admiralty rule of divided damages. Here the manufacturers seek indemnity from the government based upon a breach of the government's duty of care owed to Glover; whereas, in contrast, the divided damages rule in issue in *Weyerhaeuser* was based upon the duty of care that the government owed to the suing indemnitee.

Moreover, in *Ryan Stevedoring Co., supra*, the Court permitted the government to be sued in indemnity because the government allegedly had breached a *contractual* or warranty duty to indemnify the third-party plaintiff for injuries incurred by the government's employees. Again, as in *Weyerhaeuser*, the obligation sued upon ran from the indemnitor to the indemnitee. Nothing comparable is to be found in the instant suit.

b. *Whether a private employer could be used for indemnity under similar circumstances.*

As previously noted, the Federal Tort Claims Act directs not only that this Court look to local law in determining whether the government is subject to this indemnity suit, but also that the Court find whether a private person, in the government's position, would be so liable. Title 28 U.S.C. § 2674 provides that the United States is to be liable under the Federal Tort Claims Act only "in the same manner and to the same extent as a private individual under like circumstances."

■■ Under Virginia indemnity law, a private employer unquestionably is insulated from third-party indemnity claims when its employee has received workmen's compensation benefits and thus is precluded from bringing suit against the employer. As apparently is the case with the FECA exclusivity provision, the Virginia workmen's compensation statute is not broad enough, by its terms, to bar expressly the bringing of third-party indemnity claims arising from injuries incurred by employees. Rather, the courts have determined that, as a matter of the common law of indemnity, a third-party has no suit in indemnity against an employer who is himself shielded from tort liability to his employee. *See, e. g., Jennings v. Franz Torwegge Machine Works, supra.* Consequently, in accordance with 28 U.S.C. § 2674, it follows that the United States, as an employer whose employees are precluded from tort suit against it, also should be insulated from third-party indemnity claims.

A recent Fourth Circuit decision, involving a suit brought under the Suits in Admiralty Act rather than the Federal Tort Claims Act, indicates the willingness of the Fourth Circuit to give effect to a provision in the mold of 28 U.S.C. § 2674. In *United States Lines v. United States*, 593 F.2d 570 (4th Cir. 1979), the Fourth Circuit dealt with a provision of the Suits in Admiralty Act that limited the liability of the United States to those instances in which a private individual would be subject to suit. *See* 46 U.S.C. § 742. Recognizing that a private person in the government's place would not have been subject to such an indemnity claim [*see* 33 U.S.C. § 905(b)], the court held that no cause of action existed against the United States. *Id.* at 572.

Applying the rationale of *United States Lines* to the present case would go a long way toward eliminating the problem of "circuity of action" identified by the Fourth Circuit in its decision. Here, as in the *United States Lines* case, the availability of a third-party indemnity suit against the government means that for all practical purposes, the United States can be liable, albeit indirectly, for injuries sustained by its federal employees. In the context of this case, permitting the manufacturers to seek indemnity from the United States would render the government not only liable for all the FECA benefits paid to Glover, but also responsible for any amounts Glover might recover for his personal injuries. In effect, the purpose underlying the FECA exclusivity provision would be defeated, and the government, in turn, would be unduly burdened.

In summary, we find that the manufacturers, as a matter of law, may not sue the government seeking indemnity in this case. Virginia law, our source for determining the substantive duties and liabilities of the parties, directs that a claim for noncontractual indemnity will not lie against a party who cannot be liable in tort to the original plaintiff. Consequently, since the United States is insulated from tort liability to Glover, the United States is similarly protected from the manufacturers' third-party indemnity claim. Moreover, because a private employer, under Virginia law, cannot be sued for indemnity, the United States cannot be so sued by virtue of 28 U.S.C. § 2674.

Although we hold that the manufacturers have no cause of action in this case, we, nevertheless, proceed to address the actual evidence before the Court presented to determine whether, on the facts (without regard to the law), the manufacturers are entitled to indemnity from the government. Such a determination necessarily involves the resolution of three principal questions: (1) Was the manufacturers' $69,000 settlement with Glover reasonable? (2) Are the manufacturers precluded, by their own conduct with reference to Glover, from recovering against the government on their in-demnity claim? (3) Was the government's negligence toward Glover, if any, more egregious than the negligence of the manufacturers, thus warranting the imposition of indemnity?

## B

*Have the Manufacturers Established their Entitlement to Indemnity under the facts of this case?*

1. *Was the Manufacturers' Settlement Reasonable?*

The manufacturers settled with Glover for $69,000.

At trial, the United States made some effort to contest the reasonableness of the manufacturers' settlement, seeking to establish, through cross-examination of Doctor James Baker, that Glover's respiratory problems could have resulted from his obesity rather than from asbestosis. We find the government's argument unpersuasive and conclude that the $69,000 settlement was entirely reasonable.

■ A word about the settlement procedure employed in this case is in order, as it bears on our conclusion. When the manufacturers entered into serious settlement negotiations with Glover, they offered the United States the opportunity to participate. The government refused. In our view, the manufacturers' invitation, though rejected, spares the manufacturers from the task of establishing the *fact of their own liability* in order to recover indemnity from the government. Rather, because the United States was amply afforded the opportunity to take part in the settlement discussions with Glover, the manufacturers here need only establish their *potential* liability to Glover in testing whether settlement was reasonable. *Parfait v. Jahncke Service, Inc.*, 484 F.2d 296 (5th Cir. 1973), *cert. denied*, 415 U.S. 957, 94 S.Ct. 1485, 39 L.Ed.2d 572 (1974). This is not a case where the party from whom indemnity is sought had no chance to protect its interests by taking part in the settlement. *Cf. Jennings v. United States*, 374 F.2d 983 (4th Cir. 1967).

Accordingly, we hold that the manufacturers need only establish that they were potentially liable to Glover to withstand the government's challenge of the reasonable character of the Glover settlement.

■ Applying such a standard to this case, the evidence plainly supports a finding that the manufacturers were potentially liable to Glover. Glover was a shipyard employee for three and a half decades. In his answer to interrogatories propounded by the manufacturers, Glover claimed that he was exposed to asbestos-containing products nearly every day on the job as a pipe-coverer and insulator. In addition, Clifford Sheckler, a longtime director of industrial health and safety for Johns-Manville, acknowledged that workers using products containing asbestos might not see the manufacturers' warning labels alerting them to danger. As a result, it was certainly possible and probable that Glover, in alleging that the manufacturers failed to warn him of the hazards associated with asbestos, had a provable claim.

In addition, the manufacturers were confronted with competent medical testimony that Glover had asbestosis. When Dr. Baker examined Glover in November of 1978, he found many symptoms manifesting the presence of asbestos: Glover's shortness of breath; a sound like "growls" in his lungs; a heavy feeling in the stomach. Chest X-rays indicated that Glover's lungs were smaller than they should have been. Based on these findings, Dr. Baker diagnosed Glover as a victim of asbestosis.

Indeed, the United States itself was persuaded by the medical evidence of Glover's asbestosis. In December of 1975, the government retired Glover on asbestosis disability and has paid him $45,582.40 to date and is continuing to pay him $16,275.22 per year.

■ In addition to being reasonable in terms of the potential exposure, the settlement was also reasonable in terms of amount. The $69,000 figure was most reasonable, given Glover's forced retirement and his physical discomfort, as well as the fact of a $750,000 verdict returned in this Court by a jury in a prior asbestos trial.

We find that the settlement was reasonable.

2. *Does the evidence of character of the manufacturers' own negligence preclude them from recovering indemnity?*

Beginning our review of the record to determine whether the manufacturers have made their case, we note at the outset that Virginia indemnity law traditionally has only allowed a party seeking indemnity to shift the *entire* burden of loss to another when the indemnitee's negligence is "passive" or "technical" in relation to the indemnitor's "active" negligence. As the Virginia Supreme Court has declared:

> [W]here a party is only a technical wrongdoer, and did not actually participate in the wrongful act, such party, on being compelled to pay damages to injured party, is entitled to contribution or indemnity from the actual wrongdoer. *McLaughlin v. Siegel*, 166 Va. 374, 185 S.E. 873, 874 (1936).

"The inquiry is always whether the difference in the gravity of the faults of the participants is so great as to throw the whole loss upon one." *United States v. Savage Truck Line*, 209 F.2d 442, 447 (4th Cir. 1953), *cert. denied*, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098 (1954). *See also Wallenius Bremen v. United States, supra* at 998.

a. *Were the manufacturers negligent?*

■ In his complaint, Glover alleged that the manufacturers had breached a duty of care owed to him in failing to warn of the dangers involved in the use of their asbestos-containing thermal insulation products, and in failing to direct him to take reasonable measures to deal with their products safely. The manufacturers owed Glover such a duty to exercise reasonable care. As manufacturers and suppliers of products containing a substantial asbestos content, the third-party plaintiffs marketed a product in which "the danger of injury stems from the product itself and not from any defect in it." *See Spruill v. Boyle-Mid-*

*way, Inc.*, 308 F.2d 79, 83 (4th Cir. 1962). Moreover, the danger created by asbestos was not, by itself, obvious to the unwarned user of the product. The manufacturers had an obligation to anticipate reasonably foreseeable risks and to warn Glover of them. *Spruill v. Boyle-Midway, Inc., supra.*

Such a duty to warn depended, in part, on what the manufacturers knew or should have known about the risk of harm created by their products, or the magnitude of that risk. *Id. See generally* Dillard and Hart, "Product Liability: Directions for Use and the Duty to Warn," 41 *Va.L.Rev.* 145 (1955). From the evidence presented at this trial, we find that the manufacturers, no later than 1964, had *actual* knowledge of a significant health hazard created by the exposure of insulators to asbestos-containing thermal products. While the industry generally had been aware of the hazard of asbestos as a risk to its *manufacturing* workers (dealing with 100% asbestos) since the 1930's, the existence of a substantial risk of asbestos-related diseases for *insulation workers* (working with products only 10–15% asbestos) did not come to light until 1964 when Dr. I. T. Selikoff and colleagues presented a paper to the New York Academy of Science discussing a survey of insulation workers taken to detect the incidence of asbestosis among them. Entitled "The Occurrence of Asbestos Among Insulation Workers in the United States," the paper revealed that nearly half of the workers examined had pulmonary asbestosis. Based upon this survey the authors concluded that "asbestosis and its complications are significant hazards among insulation workers."

Given the availability of such knowledge about the hazards of asbestos to insulation workers, a hazard particularly acute for insulators with decades of exposure to asbestos-containing products, we find that the manufacturers had the duty to call attention of the danger to insulation workers. Consequently, the steps actually taken by the manufacturers must be adjudged according to this standard. After all, "[t]he sufficiency of the warning is to be judged on the basis of the nature of the danger, and the degree of care required is 'commensurate with the risk therefrom reasonably to be foreseen.' " *Spruill, supra,* at 86. *See also McClanahan v. California Spray Chemical Corp.*, 194 Va. 842, 75 S.E.2d 712, 718 (1953). (" 'The common law requires a higher degree of care and vigilance in dealing with a dangerous agency than is required in the ordinary affairs of life and business which involve small risks of injury.' ") Accordingly, to weigh comparative fault under passive or active tests we must determine what the manufacturers did to warn Glover of the danger created by asbestos, and whether the warnings given were adequate to convey the message of risk to Glover.

With reference to the manufacturers' actions to warn Glover of asbestos-related dangers, we make the following *Findings of Fact*:

(1) Prodded into action by the Selikoff report, Johns-Manville and Eagle-Picher, two of the corporations seeking indemnity in this suit, began placing warning labels on boxes of asbestos-containing thermal products. The labels cautioned that the long-term inhalation of asbestos "in excessive quantities . . . may be harmful," and advised persons working with asbestos to wear respirators if in areas without "adequate ventilation control." Owens-Corning and Pittsburgh Corning, two other manufacturers involved in this suit, began labeling cartons of asbestos-containing products in 1968. All asbestos manufacturers adopted such labeling practices in 1972, goaded by OSHA.

(2) These manufacturers did not affix the cautionary labels on the individual asbestos products, explaining that many products had a surface texture not conducive to printed warnings. Accordingly, once the asbestos-containing products were removed from the boxes, they bore no warning label.

(3) Through the National Insulation Manufacturers Association (NIMA), manufacturers of asbestos products (principally Johns-Manville) undertook to educate their purchasers as to the hazards arising from prolonged exposure to asbestos, and to in-

struct product users as to measures to take to control injurious exposures. NIMA offered an educational seminar to roughly a thousand insulation contractors throughout the United States. NIMA regarded the contractors as a conduit through which to pass information to insulators working in the field with asbestos-containing products.

(4) NIMA also put together a booklet devoted to ways to handle asbestos safely, and distributed the writing throughout the insulation industry in the early 1970's.

(5) Johns-Manville sponsored the Insulation Industry Hygiene Research Program (IIHRP), to learn more about the hazards of asbestos and to communicate the nature of such hazards to those involved in the insulation industry. Among other things, IIHRP prepared and dispensed "green sheets" to asbestos workers through their union's monthly magazine. The "green sheets" focused upon the risk created by breathing asbestos fibers, and counseled as to means to minimize the resulting danger, but a distribution of "green sheets" to government insulators is not shown.

(6) In conjunction with efforts to publicize the risks attendant to use of asbestos-containing products, the manufacturers began working to eliminate asbestos from their products altogether. Such efforts included too, an attempt to market "bonded" asbestos products, which by virtue of a coating administered to them, were less likely to emit asbestos fibers into the air.

(7) Several manufacturers, including Eagle-Picher and Southern Asbestos, visited Naval installations to show their bonded asbestos products and to discuss the sale of nonasbestos-containing substitutes for those products required by government specifications.

(8) Naval officers Rosenwinkle and Barboo, upon invitation, visited Johns-Manville's New Jersey plant in 1969 to discuss possible substitute products for those containing asbestos and were shown some asbestos-free insulation materials, but nothing commercially feasible at that time.

(9) Despite the above-mentioned efforts to disseminate information concerning the risk of harm posed by asbestos to insulators, there is no evidence in the record that Glover received warning of danger or was instructed on steps to take to avoid injury-producing exposure to asbestos. Focusing upon the September, 1974 to January, 1975 period, there is no indication that Glover had the opportunity to read or see any warning labels affixed to cartons of asbestos-containing insulation products as he supervised pipecovering and insulation activities in Shop 56. As Clifford Sheckler, a former employee of Johns-Manville, conceded in his testimony at trial, insulators working with asbestos-containing insulation did not have the benefit of the manufacturers' warning labels once the product was taken from the box in which it had been packaged. It is questionable that placing labels exclusively on cartons served to convey the cautionary message about asbestos to those insulators foreseeably using asbestos products after they had been unboxed. We can only assume that Glover was among such a segment of unwarned insulators, given the absence of testimony by Glover or anyone else in Shop 56, that Glover had actual access to the warning labels provided.

(10) This Court finds that the failure to reasonably communicate the warning to Glover by the manufacturers was negligence under the circumstances of this case. The manufacturers had a duty to warn of the risk of harm latent within asbestos-containing products that included providing notice of the hazard "in such form that it [the warning] could reasonably be expected to catch the attention of the reasonably prudent man in the circumstances of its use." *Spruill, supra* at 85. Knowing that the warning labels and the danger were separated once the product left the box, and that insulation work would involve persons who had not seen the box or its label, the manufacturers had to do more to communicate the message of risk than they did. Given the magnitude of the risk and the nature of the harm caused by *preventable* exposure, the manufacturers had a high duty of care to satisfy in regards to Glover which, as to Glover, they failed to satisfy.

(11) Because we find that Glover, on the evidence here presented, did not even see the warning label in the course of his work at Shop 56, we need not pass on the sufficiency of the warning label that the manufacturers placed on their cartons of asbestos-containing products.

(12) In addition, there is no evidence that Glover was ever apprised of the safety practices included in the NIMA booklet or that he attended a NIMA-sponsored seminar on asbestos. In truth, the NIMA-related activities were geared to take the message of asbestos-related hazards to insulators in the private sector. The NIMA seminars were administered to private contractors. Such communications were not shown to have been calculated to put Naval employees, like Glover, on notice of the danger.

(13) The manufacturers' attempts to reduce the percentage of asbestos in their products, or to eliminate asbestos altogether, though well advised under the circumstances, did nothing to convey *to Glover* the character of the danger he confronted on a daily basis at the Shipyard.

(14) There is no evidence that the manufacturers even attempted to warn insulators like Glover of the risks of harm attendant to "ripout" work at the Yard. The warning labels, educational programs and the like were geared to risks arising from the installation of new asbestos products. Nothing that the manufacturers did would have put Glover on notice that the replacing of old asbestos products constituted a potentially more dangerous activity than did working with new products.

In sum, we find on this record that the manufacturers deprived Glover of the information he needed to make an intelligent choice about a danger he confronted on a daily basis. If Glover had known about the risk involved in breathing asbestos fibers, he would have been in a position to decide whether he wanted to continue working with asbestos. Absent such knowledge, however, Glover lost the chance to choose for himself the risks to which he would expose himself. *See Borel v. Fibreboard Paper Products Corporation*, 493 F.2d 1076, 1089 (5th Cir. 1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). ("An insulation worker, no less than any other product user, has a right to decide whether to expose himself to the risk.")

Mindful that a number of claims are pending against the manufacturers, brought by Shipyard pipecoverers like Glover, we feel compelled to add a word of caution. We make our determination as to the manufacturers' negligence based upon the facts as established in this particular case.

b. *Was the Manufacturers' Negligence "Active," to Bar Indemnity?*

■ A party may only prevail on its indemnity claim if its negligence is in some sense "passive" or "secondary" in bringing about the injury suffered by the original claimant. Indeed, under Virginia indemnity law "active" negligence prevents a party's seeking indemnity altogether. *Hartford Accident and Indemnity Company v. Williams*, 291 F.Supp. 103 (W.D.Va.1968). The question therefore arises whether, given this Court's finding that the manufacturers' negligence failed to apprise Glover of the risk of harm latent in their products, the manufacturers are effectively barred by their own misconduct from recovering in indemnity.

■ We are of the opinion that the manufacturers' failure to warn Glover is "active" negligence of a sufficiently egregious character to preclude their indemnity claim as a matter of law. The manufacturers marketed asbestos products that, inadequately identified as to the danger concealed within them, caused Glover to develop asbestosis. In effect, the manufacturers first created the hazard by developing and distributing products carrying a latent danger, then rendered Glover vulnerable to the hazard by failing to put him on notice as to a risk he could not detect on his own. By comparison, *any* negligence on the part of the United States occurred when the government tried to control a hazard that it had "purchased" from the manufacturers. In other words, the manufacturers' negli-

gence set in motion the tragedy that was to ensue, a tragedy claiming Glover as one of its numerous victims.

The decision rendered in *Hartford Accident and Indemnity Company v. Williams, supra,* reenforces our determination. In *Williams* the court had to deal with indemnity claims arising out of electrical shocks suffered by workmen whose crane came into contact with high tension wires. After the workmen had recovered from several parties for their injuries, the various defendants sought indemnification from one another. In the course of its decision making, the *Williams* court held that two of the parties were precluded from indemnity recovery because they had been *actively* negligent in causing the workmen's injuries. Since both parties had failed to warn either the workmen or the crane operator of the danger posed by low-hanging electrical wires, both parties could not prevail on their indemnity claim. Indeed, the court declared, "[r]ecovery amongst joint tortfeasors, absent contract, is limited to contribution." *Id.* at 105.

In the present case, as in *Williams,* the parties seeking indemnity were in an excellent, albeit even better, position to warn of the risk of harm and thereby spare the injured person from injurious exposure to the source of the risk. As in *Williams,* then, the negligent failure to warn on the part of the manufacturers could be properly characterized as active or primary. *See also Caruloff v. Emerson Radio,* 445 F.2d 873 (2d Cir. 1971). (A TV set manufacturer was actively negligent in failing to warn a repairman of latent danger, and thus was barred from indemnity recovery.)

The manufacturers, as if anticipating the Court's finding as to their conduct, argue that the negligence, considered active under most circumstances, was passive in this case because the United States also knew of the danger and yet failed to act on such knowledge. The manufacturers cite several decisions that purportedly support their argument.

A reading of these cases, however, convinces us that the manufacturers have premised a fundamentally untenable legal position on some readily distinguishable decisions. Two of the cases involved obvious cases of product misuse. In both *Brown v. General Motors Corporation,* 355 F.2d 814 (4th Cir. 1965), *cert. denied,* 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 600 (1967) and *Marker v. Universal Oil Products Company,* 250 F.2d 603 (10th Cir. 1957), the courts absolved the manufacturers from liability entirely in suits brought by injured workmen because such workmen had employed the injury-causing products in an unforeseeable fashion. In effect, the courts ruled that the manufacturers had no duty to warn of dangers arising from the totally unanticipated misuse of their products. In the present case, to the contrary, injurious exposure to asbestos arose from work with the product in the very way it was intended to be used. The danger posed by asbestos fibers was hardly the result of an unexpected abuse of the product (as if, for example, Glover had ingested the asbestos).

Moreover, in *Littlehale v. E. I. duPont de Nemours & Co.,* 380 F.2d 274 (2d Cir. 1967), the court absolved an ammunition manufacturer of liability for injuries sustained by untrained service personnel by explosions because the government, as purchaser of the ammunition, had assured the seller that only experts would use the explosives. In fact, the United States had persuaded the manufacturer to delete certain customary language from its warning label because, in the government's opinion, such precaution was unnecessary, given the training of the expected users. More than a decade after the sale, however, the government gave the explosives to untrained users and harm ensued. In the present case, as opposed to *Littlehale,* Glover was exactly the type of worker that the manufacturers had reason to anticipate would use their product in the way that he did, *i. e.,* fashioning it to fit pipes and exposed heated surfaces. Additionally, the United States Navy made no representation to the manufacturers at the time of sale that Glover and his fellow insulators at the Shipyard had been specially trained in the use of asbestos and therefore required no warning.

To complete our review of the record, we turn finally to the government's alleged negligence in dealing with the hazard that asbestos created for its shipyard employees.

3. *Was the Government's negligence, if any, "active" negligence causing Glover's asbestosis?*

 To be liable in indemnity, the United States must have been guilty of "active" or "primary" negligence in causing Glover to incur injury. Undoubtedly, whether the standard of care used is the product of state or federal law, the United States had the duty to exercise reasonable care to provide Glover with a safe place to work. Accordingly, we make the following *Findings of Fact* with reference to the government's actions in confronting and dealing with asbestos linked dangers:

(1) From 1964, when Dr. Selikoff delivered his paper on the danger posed by asbestos to insulators, various agencies within the United States government were aware of the risk of harm carried by asbestos containing thermal insulation products. It appears that representatives of the Armed Forces and the Public Health Service attended Dr. Selikoff's presentation of his study at the New York Academy of Science.

(2) The United States Navy began to learn more about asbestos-related risks and William Marr, an Industrial Hygienist at the Long Beach Naval Shipyard, published an article on insulation work at the shipyard. In the course of the 1965 article, Marr described shipboard pipe covering as a "hazardous trade."

(3) Norfolk Naval Shipyard personnel were also made cognizant of the asbestos problems in the 1960's. Seymour Levinson, the Industrial Hygienist at the Shipyard from 1960 to 1971 was aware, by 1965, that a prolonged exposure to amounts of asbestos dust exceeding the accepted TLV (for decades set at five million particles of dust per cubic foot of air) could cause asbestosis. Moreover, dust counts that Levinson had taken in Shop 56 over the period of 1960 to 1965 revealed that the concentration of asbestos fibers in the air at the Shop some-

times exceeded the accepted TLV. As a member of the American Conference of Governmental Industrial Hygienists (ACGIH), Levinson knew of the research developments with respect to the risks attendant to asbestos. Based on such knowledge, Levinson recommended that the Shipyard curtail its use of asbestos, which, the evidence shows, was done.

(4) Dr. Packovich, a Navy physician stationed at the Norfolk Naval Shipyard in 1967–68, examined insulators and pipe coverers at Shop 56 and found that of the 111 workers x-rayed, four had work related asbestosis and another six were classified as "asbestos suspects." William Glover was one of these "asbestos suspects," and his health was more closely monitored subsequently.

(5) Increasingly aware of the magnitude of the asbestos problem in the Naval shipyards through the United States, the Navy took two general approaches in dealing with the problem. First, beginning in 1965, the Navy circulated a series of instructions, directing the shipyards to implement various control measures to lessen the risk associated with work around asbestos products. Second, from 1969 onward, the Navy took steps to eliminate asbestos products altogether.

(6) With reference to the measures taken to minimize dangerous exposures to asbestos fibers, the Norfolk Naval Shipyard issued a "Standard Procedure" for dealing with dangerous concentrations of so-called "air contaminants" in 1965. The document recommended respirators as the primary means to avoid injurious exposure to such contaminants, which included asbestos dust.

(7) At the same time, the Navy itself distributed a document entitled "Safety Precautions for Shore Activities," encouraging yards to improve ventilation in areas where asbestos dust was a by-product of insulation work and to have workers wear dust respirators when adequate ventilation was not possible.

(8) Notwithstanding such instructions, when Edward Cherowbrier of the Bureau of Ships (BuShips) visited the Norfolk Na-

val Shipyard in 1969, he observed that the general conditions of Shop 56 did not meet all the standards set forth in the safety literature. Cherowbrier testified that Shop 56 lacked adequate ventilation or air filtration system, and that the yard employees were not following instructions to use their respirators when cutting asbestos products.

(9) To upgrade the quality of control measures, the Naval Ships Systems Command issued "Safety Precautions Concerning Asbestos Dust," with the express purpose "[t]o emphasize the necessity for employing required precautionary measures when employees are working in areas where they are exposed to asbestos dust." Essentially the concern was over improving ventilation and encouraging the use of respirators to minimize the airborne danger posed by asbestos fibers. In conjunction with this instruction, the Norfolk Naval Shipyard put together a document dealing with the asbestos hazard in November of 1969. The publication focused upon the disease of asbestosis, and announced *inter alia* the Yard Commander's intention to have all insulators clinically examined on a semi-annual basis. The document further detailed the cautionary steps to take in every aspect of asbestos-related work, including the installation and removal of asbestos-containing insulation materials.

(10) Again, despite the efforts of the Yard and the Navy to improve safety measures in the use of asbestos products, an audit of Shop 56 revealed problems in the administration of such controls.

(11) In September of 1970, Admiral Rickover wrote a memorandum to the Naval ·Ships Systems Command (NavShip), reflecting his concern that the extensive use of asbestos in pipe and boiler insulation continued unabated despite medical evidence that asbestosis and related diseases resulted from such use. In part, Admiral Rickover recommended that the Navy try to eliminate its reliance upon asbestos insulation to the greatest extent practicable.

(12) Reflecting Admiral Rickover's concern, the Shipyard Commander issued new instructions concerning the control of the asbestos problem in 1971. The instruction set forth a lengthy list of measures to be taken in every phase of asbestos related work. Fabrication work was to be performed separately from other activities; industrial type vacuum cleaners were to be used to clean up asbestos dust; discarded asbestos-containing materials were to be thrown out in waste containers with disposable plastic bags. Workers installing the products, moreover, were to wear respirators in the course of their work. Finally, workers performing "ripouts" were to wet down the asbestos insulation before tearing into it, and were to accomplish their task at times when other workers were not present. The above-mentioned control measures were not exhaustive of the list included in the 1971 instruction, but were representative of the safety measures to be taken.

(13) The Chief of the Navy's Bureau of Medicine and Surgery (BuMed) supplemented the already formidable list of safety measures with an instruction given general circulation in 1973. In a general fashion, the BuMed instruction reviewed types of equipment to use to avoid exposure to asbestos fibers, and mentioned the need to affix warning labels to raw asbestos products.

(14) The Chief of Naval Operations (OpNav) followed up on the BuMed instruction with its own safety-oriented instruction in 1974. The OpNav instruction set a new and lower ceiling for exposure to asbestos fibers, bringing the Navy into line with OSHA standards, and reiterated the litany of controls available to minimize the injurious exposure to asbestos containing products.

(15) Though Naval administrators obviously were concerned over the asbestos hazard and sought to implement safety control measures for work involving asbestos products, admittedly the directed safety measures were not always followed.

■ (16) Based upon the record of this case, we find that the government did negligently fail to fully carry out and implement the range of safety devices that the

government knew were essential. In particular, the United States failed to satisfy the duty of care it owed Glover, as its Yard employee during the period of September, 1974 to January, 1975. Indeed, Shipyard personnel also failed to provide Glover with the warning labels that we previously determined the manufacturers should have provided for users of their products.

(17) At the same time, however, we do not find that the government's negligence was "active" or "primary" in the same sense that the manufacturers' negligence was active. We reach this result, in part, because of the predicament in which the United States, as the manufacturers' ever faithful customer, found itself. Once it became aware of the asbestos problem, the United States composed an admirable list of measures to be taken to deal with the hazard far exceeding efforts of the manufacturers. Given the extent of the risk of harm created by asbestos fibers, the government faced a difficult task in trying to make the workplace environment safe for insulators. In effect, the government had to deal with a health hazard created by the manufacturers' products. Consequently, the negligence resulting from attempts to control the hazard, once recognized, was "secondary" to the negligence involved in setting loose dangerous products upon a vulnerable work force.

Moreover, it is worth noting that the Navy took steps to upgrade its control measures with the but minimal assistance of the manufacturers. Though the manufacturers claimed to have been in constant touch with the Navy about the use of asbestos substitutes or bonded products, they did not contact Shipyard officials to emphasize the need for safety measures in dealing with asbestos fibers in the workplace. Presumably, the manufacturers believed that randomly mailed NIMA safety booklets and "green sheets" would convey the message of safety in a satisfactory fashion.

(18) The United States also endeavored to eliminate its purchase of asbestos products entirely, beginning its search for substitute products as early as 1969. By 1971, Naval purchasers had discussed the use of substitute asbestos-free products or, alternatively, the use of bonded asbestos products with such manufacturers as Johns-Manville, H. K. Porter and Eagle-Picher. Such discussions produced little immediate results, as the substitute products often did not measure up to the government's performance specifications necessary in the extreme heat situations in nuclear submarines, for instance.

(19) Even so, the Navy stopped purchasing amosite felt and amosite pipecovering by amending its military specifications and the "Qualified Products List," the catalogue of government sanctioned products suitable for purchase, in 1971 and 1972.

(20) Moreover, in 1973 the Navy amended pertinent military specifications to eliminate future purchases of all asbestos containing pipecovering and block.

(21) Despite such efforts to curtail the purchase of harm causing asbestos insulation products, the Norfolk Naval Shipyard purchasing agent continued to order such products from the General Services Administration (GSA). We can only presume from the evidence adduced at trial that GSA continued to dispense already purchased asbestos products to those Naval facilities that needed such products. Accordingly, Larry Hackler, as the Norfolk Naval Shipyard's Safety Inspector, observed asbestos containing thermal pipecovering in use in Shop 56 during the period of 1973–75.

(22) Though we find that Shop 56 continued to receive asbestos thermal products well after the Navy had nominally eliminated its requirements for such products, and that Glover apparently may have been exposed to these products during the September, 1974 to January, 1975 period in question, we do not find that the Navy was negligent merely for allowing the products into Shop 56. Unquestionably, the government owed Glover the duty to provide him with a safe workplace. Yet such a duty did not mandate that the Navy eliminate its purchases of asbestos altogether, when the evidence is that no alternate product was available in many high heat situations. Rather, the Navy could have continued to buy asbestos products, so long as it imple-

mented the full panoply of safety control measures needed to make work with asbestos a reasonably safe enterprise. As it was, the government decided to curtail its dependence upon asbestos because it recognized that the safety control measures it had devised for shipyard work were difficult to implement.

(23) Any such negligence, however, was not more active than the negligence of the manufacturers with respect to Glover. The manufacturers marketed products carrying the potential of disease for those not fully apprised of the danger or of the means to deal with such danger in safety; the manufacturers failed to give Glover sufficient information so that he could decide whether he wanted to expose himself to the product or to seek ways to avoid such exposure; the manufacturers put a lethal risk of harm in Glover's work environment, then allowed Glover unwittingly to confront the risk with tragic results, on a daily basis.

The government, in turn, failed to take adequate steps to protect Glover from the danger when it began to realize the extent of the asbestos problem. Yet its role in the developing tragedy was secondary to the role played by the manufacturers in setting loose the asbestos hazard upon Glover's workplace. Indeed, the government was in the position of trying to minimize the threat posed by the manufacturers' products. Though the government did not succeed in saving Glover from the hazard, and though such a failure was due, in part, to bureaucratic ineptitude and a slowness to implement safety control measures, the government was certainly *no more* culpable than the manufacturers in bringing about Glover's injury and, in our view, *was considerably less*. Accordingly, the United States, by virtue of its own negligence, does *not* have to indemnify the manufacturers for the settlement they made with Glover.

## III

### Conclusion

We hold that the manufacturers are not entitled to recover indemnity from the United States for the following reasons:

(1) The manufacturers, as a matter of law, cannot bring an indemnity suit against the government under the Federal Tort Claims Act because Glover, as a recipient of FECA benefits, could not sue the government for his injuries.

(2) Alternatively, based upon a review of the record in this case, the manufacturers failed to warn Glover adequately of the danger latent in their products, and thus are prevented from recovering in indemnity by their active negligence.

(3) Finally, though the United States was negligent in its implementation of safety control measures to minimize a known risk of harm, the government was no more negligent, and, in fact, was less negligent, than the manufacturers, who unleashed their dangerous products on Glover's workplace. Thus, the government's conduct was not so egregious as to prompt this Court to impose upon the United States the *entire* burden of loss occasioned by Glover's asbestosis.

Though the manufacturers amended their third-party complaint to include, *inter alia*, a request for contribution in the event that their claim for indemnity did not succeed, they made no mention of their contribution claim at trial or thereafter. It should be readily apparent, however, that we are of the opinion that an action for contribution would be precluded, as a matter of law, by the absence of tort liability from the United States to Glover. The *Gretakis* case, *supra*, represents the Virginia rule on this question, a rule that we must heed for the purposes of this Federal Tort Claims Act suit. *See* 28 U.S.C. § 1346.